**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                    Case No. 09-20225

SCOTT SAMONEK,

      Defendant.

_____/

**ORDER DENYING DEFENDANT'S "MOTION TO SUPPRESS"**

Before the court is Defendant Scott Samonek's "Motion to Suppress," filed on November 13, 2009. On November 25, 2009, the Government filed a response. Having reviewed the briefs, the court concludes a hearing on this Motion is unnecessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will deny Defendant's Motion.

**I. BACKGROUND**

On May 21, 2009, Defendant was indicted on four counts: (1) distribution of cocaine, 21 U.S.C. § 841(a)(1); (2) possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1); (3) possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c); and (4) felon in possession of a firearm, 18 U.S.C. § 922(g)(1). The charges arise out of the execution of a search warrant at Defendant's residence by the Dearborn Heights Police Department on December 3, 2008, as well as five controlled purchases of narcotics leading up to the execution of the warrant. (Def.'s Br. at 1; Govt.'s Resp. at 1.) A search of Defendant's residence revealed 146 grams of cocaine, drug paraphernalia, a large sum of cash, ammunition, and seven loaded firearms, including a particularly lethal Bushmaster .223 caliber rifle found near a double drum magazine. (Def.'s Br. at 1; Govt.'s Resp. at 1.)

On December 3, 2009, a Judge of the 20th District Court, Wayne County, Michigan issued a search warrant for 6809 Rosemont Ave., Detroit, Michigan, 48228,[1] in order to seize narcotics, firearms, and related materials.  (Govt.'s Ex. A at 1.)  A Dearborn Heights Police Officer assigned to the Special Operations Bureau as a narcotics investigator submitted a four-page affidavit in support of the issuance of the warrant.  (*Id.* at 2.)  The affiant stated that he had "attended numerous schools and seminars in the identification and trafficking of narcotics."  (*Id.*)

In the affidavit, the officer described the following facts as supporting the issuance of the warrant:  The investigation began when Confidential Informant 699 ("the CI") informed the officer of a person with the street name of "Spook" who "sells Cocaine from his cell phone and delivers his product."  (*Id.* at 2.)  The CI stated that he had purchased cocaine from "Spook" at least fifty times and that "Spook" drives a black GMC Yukon Denali.  (*Id.*)  After investigation, officers were able to determine that "Spook" was the Defendant and that Defendant resided at 6809 Rosemont Ave., Detroit, Michigan, 48228 and owned a 2002 GMC Yukon Denali.  (*Id.*)

The first controlled purchase occurred on October 23, 2008.  (*Id.*)  The CI called Defendant on his cell phone and ordered a quantity of cocaine.  (*Id.*)  Defendant stated that he had the cocaine, gave a price, and told the CI to meet him at a Chili's on Southfield Service Drive and Ford Road.  (*Id.*)  The CI rode in the affiant's vehicle to the Chili's and called Defendant when they arrived, while other officers set up surveillance in the area.  (*Id.*)  The CI was searched for contraband and was provided pre-recorded funds.  (*Id.*)  After five minutes, Defendant arrived in a black Yukon Denali.  (*Id.*)  The CI made contact with Defendant, entered Defendant's vehicle, purchased a bag of cocaine, and then returned to the affiant's car and gave the bag of cocaine to the affiant.

---

[1]The home-address redaction requirement does not apply to search warrants. *See* Fed. R. Crim. P. 49.1(b)(8).

(*Id.*)  The surveillance officers then followed Defendant as he pulled out of the parking lot.  (*Id.* at 3.)  They "were able to follow [Defendant] directly to 6809 Rosemont Ave in Detroit where he pulled up into the driveway and was observed by R. Smith going into the front door of the location."  (*Id.*)

On November 4, 2008, the CI initiated another controlled purchase of cocaine from Defendant.  (*Id.*)  They agreed to meet in a parking lot in the area of Ford Road and Southfield Service Drive, but Defendant "indicated to the CI that he had to stop by his house first before making the meet."  (*Id.*)  Another officer, Cpl. Meyers, initiated surveillance of Defendant's house and observed Defendant's Yukon "pulling in the driveway at 6809 Rosemont right after the CI got off the phone with [Defendant]."  (*Id.*)  After the CI called Defendant to let him know they were at the parking lot, Cpl. Meyers observed Defendant exit his house and drive his Yukon to the meet location.  (*Id.*)  At the meet location, the CI made contact with Defendant, entered Defendant's vehicle, purchased a bag of cocaine, and then returned to the affiant's car and gave the bag of cocaine to the affiant.  (*Id.*)

A third controlled purchase occurred on November 12, 2008.  (*Id.* at 4.)  As with the other purchases, the CI called Defendant on his cell phone, ordered a quantity of cocaine, and the two agreed to meet at a location on Ford Road and Southfield Service Drive.  (*Id.*)  Cpl. Meyers was conducting surveillance of Defendant's house and observed his vehicle in the driveway.  (*Id.*)  The CI called Defendant after arriving at the meet location, and approximately five minutes after the call, Cpl. Meyers observed Defendant exit his house and drive directly to the meet location.  (*Id.*)  As before, the CI purchased a bag of cocaine from Defendant and then turned it over to the affiant.  After the sale, the "surveillance officers followed [Defendant] directly back to his house at 6809 Rosemont.  [Defendant] was observed by Cpl Meyers parking the Yukon in his driveway and going into the front door to his house."  (*Id.*)

On November 24, 2008, the CI again initiated a controlled purchase of cocaine from Defendant.  (*Id.*)  The two agreed to meet at the normal spot; however, Defendant stated that he would be in a black Cadillac this time because his normal vehicle was stolen.  (*Id.*)  Defendant instructed the CI to call him when he was close as Defendant "was out driving around in the area of Warren / Southfield."  (*Id.*)  Surveillance officers were able to locate Defendant getting into a black Cadillac in the area of Warren / Rosemont, and they maintained surveillance as he drove around the area.  (*Id.* at 5.)  The CI then called and informed Defendant that he was close to the meet location, and Defendant "told the C.I. to give him 15 minutes as he had to stop by his house first."  (Id.)  The surveillance officers then:

> followed [Defendant] directly to his house located at 6809 Rosemont Detroit, MI 48228.  Cpl Meyers observed [Defendant] park the black Cadillac in his driveway and leave the car running.  Cpl Meyers observed [Defendant] exit the Cadillac and go into the front door of his house.  Approximately 2 minutes later Cpl Meyers observed [Defendant] come out of the front door and get back into the black Cadillac.  Surveillance officers then followed [Defendant] directly from his house to the meet location where Affiant was waiting with the C.I.

(*Id.*)  At the meet location, the CI purchased a bag of cocaine with pre-recorded funds and subsequently turned over the bag of cocaine to the affiant.  (*Id.*)  The surveillance officers "then followed [Defendant] from the meet location directly back to his house. Cpl Meyers observed [Defendant] pull into the driveway and exit his car. [Defendant] was then observed going into the front door of 6809 Rosemont."  (*Id.*)

On December 3, 2008, officers sought a search warrant.  In addition to detailing the above events, the affidavit stated that on December 3, 2008, the CI "is going to order a quantity of Cocaine from [Defendant] with pre-recorded funds.  If, and only if, the purchase of Cocaine is successful will the Dearborn Heights Special Operations Bureau execute a narcotic search warrant at 6809 Rosemont in the City of Detroit."  (*Id.*)  The search warrant was issued, and immediately after the fifth controlled purchase, the officers executed the warrant.  (Govt.'s Resp. at 1.)

Defendant filed the present "Motion to Suppress" on November 13, 2009.  In his

Motion, Defendant argues that the affidavit failed to establish probable cause that

evidence of a crime would be found at Defendant's residence.  (Def.'s Mot. at 2.)

## II. DISCUSSION

### A. Evidentiary Hearing

Defendant asserts that "an evidentiary hearing is required to determine the facts

of this matter." (Def.'s Mot. ¶ 2.)  This request, however, is contrary to the standard for

determining whether a search warrant is supported by facts sufficient to establish

probable cause.  Under this standard, the review "is limited to the information presented

in the four-corners of the affidavit." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir.

2005).  Here, the court has before it the affidavit that the Judge of the 20th District Court

reviewed when making the probable cause determination.  (Govt.'s Ex. A.)  Additional

evidence is irrelevant.  Accordingly, the court will deny Defendant's request for an

evidentiary hearing.

### B. Probable Cause

"The right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures, shall not be violated, and no

Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be

seized." U.S. Const. Amend. IV.

In determining whether an affidavit establishes probable cause,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that a magistrate had a substantial basis for concluding that probable cause existed.

*United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *Illinois v. Gates*,

462 U.S. 213, 238-39 (1983)) (alteration in original).  An affidavit must contain

5

"particularized facts," *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006),

and a "nexus between the place to be searched and the evidence sought," *Carpenter*,

360 F.3d at 594 (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir.

1998)).  Courts must "insist that the magistrate perform his 'neutral and detached'

function and not serve merely as a rubber stamp for the police."  *McPhearson*, 469 F.3d

at 524.  However, a magistrate's probable cause determination "should be paid great

deference by reviewing courts."  *Gates*, 462 U.S. at 236.  Indeed, "'line-by-line scrutiny

[of an underlying affidavit is] . . . inappropriate in reviewing [a] magistrate['s] decisions,'"

and "'after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the

form of de novo review.'"  *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en

banc) (quoting *Gates*, 462 U.S. at 246 n.14, 236) (alteration in original).

　　　Based on the totality of the circumstances, the judge issuing the search warrant

in this case "had a substantial basis for concluding that probable cause existed."

*Carpenter*, 360 F.3d at 594.  From the facts in the affidavit, it was apparent that

Defendant was selling drugs.  The affidavit set forth four controlled sales of narcotics by

the Defendant to the CI.  (Govt.'s Ex. A.)  On each occasion, the CI was searched and

given pre-recorded funds before meeting with Defendant in the parking lot.  The affiant

observed the CI enter Defendant's vehicle on each occasion and then immediately

return and give the affiant a bag of cocaine that he had just purchased from Defendant.

Thus, the affidavit established little doubt that Defendant sold cocaine to the CI.

　　　As Defendant was actively dealing drugs, it was likely that drugs would be found

in his house.  *See United States v. Miggins*, 302 F.3d 384, 393-94 (6th Cir. 2002) (citing

numerous cases where evidence of drug trafficking away from a dealer's house

provided probable cause to search the dealer's house).  However, these drug

transactions were not the only link to Defendant's house.  Immediately before three of

the controlled purchases, officers observed Defendant at his house and drive directly to

6

the meet location.  (Govt.'s Ex. A.)  After three of the controlled purchases, officers

observed Defendant drive directly home.  (*Id.*)  In particular, the officer's observations

before the fourth transaction established a strong nexus between the Defendant's

house and the drugs.  Before this transaction, after the CI indicated he was close to the

meet location, Defendant "told the C.I. to give him 15 minutes as he had to stop by his

house first."  (Govt.'s Ex. A at 5.)  The officer then observed Defendant pull into his

driveway, leave the car running, and enter his house.  (*Id.*)  Approximately two minutes

later, Defendant was observed leaving his house, getting in his car, and driving directly

to the meet location.  (*Id.*)  The most probable explanation for these observations is that

Defendant had to quickly stop by his house to pick up the cocaine before meeting with

the CI to sell it to him.  Law enforcement officers are entitled to formulate "common-

sense conclusions about human behavior."  *Gates*, 462 U.S. at 231-232.  Based on

these circumstances, the likely and common-sense conclusion was that Defendant

stored drugs at his house.  Accordingly, the court finds that the judge issuing the search

warrant had a substantial basis for finding there was probable cause to believe that

Defendant's house contained narcotics and related materials.

Defendant disagrees with this analysis and argues that the affidavit failed to

establish probable cause that evidence of a crime would be found at his residence.

(Def.'s Mot. at 2.)  Specifically, Defendant argues that the anticipatory nature of the

affidavit, requiring a successful controlled purchase on December 3, 2008, "eliminates

probable cause to believe controlled substances would be found in the residence,"

(Def.'s Br. at 3-4), and that the affidavit did not set forth a "sufficient nexus between the

items sought and the place to be searched due to the stale and general nature of the

information," (*Id.* at 4-6).  The court will address these arguments below.

7

### 1. Anticipatory Search Warrant

Defendant argues that there was no probable cause to believe Defendant's residence contained drugs because after the controlled purchase that triggered the execution of the search warrant, Defendant no longer had possession of the drugs. (Def.'s Br. at 4.)  Defendant reasons that because the officers now possessed the drugs, they must have known the drugs were not in the location to be searched.  (*Id.*) While it is true that *those* drugs were no longer at the house, it does not follow logically that there could no longer be *any* drugs remaining inside.  To illustrate the flaw in Defendant's reasoning, posit that a person wonders if the neighborhood store has received a shipment of apples.  He approaches the store and observes a customer walking out of the store with apples.  Defendant's logic holds that the observation means that it is less likely that the store has any apples.  Under the kind of common-sense approach required by *Gates*, however, seeing someone coming out of a store with apples means that the store probably has apples for sale –not *those* apples, of course, but apples nonetheless.  Probable cause determinations are about probabilities, not hard certainties.  *See Gates*, 462 U.S. at 231.  If a person sells drugs to another, especially repeatedly, there exists a common-sense probability that this person possesses drugs for sale in addition to the drugs that have just previously been sold.

Defendant cites to a series of cases involving anticipatory warrants and notes that they are "peculiar to property in transit."  (Def.'s Br. at 3 (citing *United States v. Prince*, No. 94-4118, 1995 WL 355671 (6th Cir. June 13, 1995)).  Defendant asserts that these warrants are upheld "so long as there is probable cause to believe that the contraband will be there when the search warrant is executed."  (*Id.* at 4 (citing *United States v. Sissler*, No. 91-2113, 1992 WL 126974 (6th Cir. June 10, 1992).)  Indeed, Defendant is correct that most cases dealing with anticipatory search warrants involve "property in transit," i.e. a controlled delivery of contraband.  In the typical case, a

package is intercepted by a postal employee, contraband is found, and law enforcement conducts a controlled delivery.  *See, e.g.*, *United States v. Jackson*, 55 F.3d 1219 (6th Cir. 1995); *United States v. Lawson*, 999 F.2d 985 (6th Cir. 1993).  In these situations, officers often obtain an anticipatory search warrant to search the address after the recipient accepts the package.  It is critical that the package be accepted at the location to be searched, because if the package is accepted elsewhere, then that eliminates the probable cause to believe that the drugs would be found at the address listed in the warrant.  *See United States v. Ricciardelli*, 998 F.2d 8 (1st Cir. 1993).  Thus, it is the successful delivery of the package that is the essential link of the contraband to the residence.

The present case is different from the conventional case involving an anticipatory warrant because the triggering event of the fifth controlled purchase was not essential to link the presence of drugs to the residence.  By the fifth controlled purchase, the officers had already established that Defendant was selling drugs and that he likely kept them at his house.  As discussed above, the observations prior to the fourth transaction, where Defendant had to briefly stop by his house before meeting the CI, are strongly indicative of drugs being kept at the house.  The officers appeared to impose the extra condition of the successful fifth controlled purchase out of an abundance of caution, to foreclose the possibility that the evidence they had acquired previously could be considered stale. The court finds no reason to punish officers for taking extra precautions to ensure that a citizen's constitutional rights are protected.

### 2. Sufficient Nexus

Defendant argues "the affidavit fails to establish the nexus between the items sought and the place to be searched." (Def.'s Br. at 4.)  Specifically, Defendant contends there was no probable cause to believe that narcotics would be found at his residence because the quantity of the sales was unknown, each transaction occurred

away from the residence, and the CI was never inside Defendant's residence.[2]   (*Id.* at

5.)

To establish probable cause for a search, there must be "a fair probability that

contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S.

at 238.  In other words, there must be a "nexus between the place to be searched and

the evidence sought." *Carpenter*, 360 F.3d at 594 (quoting *United States v. Van

Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)).  A number of cases "hold that an

informant's observation of drug trafficking outside of the dealer's home can provide

probable cause to search the dealer's house." *United States v. Frazier*, 423 F.3d 526,

532-33 (6th Cir. 2005); *see United States v. Miggins*, 302 F.3d 384, 393-94 (6th Cir.

2002) (citing, among others, *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999),

which found that "it was reasonable to suppose that drug dealer stored evidence of

dealing at home, even though no drug trafficking was observed to occur there").

However, the Sixth Circuit has cautioned against using the "defendant's status as a

drug dealer, standing alone, [as] giv[ing] rise to a fair probability that drugs will be found

in his home." *Frazier*, 423 F.3d at 533.

In this case, there was a sufficient nexus between Defendant's house and the

narcotics that were sought.  It was not the Defendant's mere status as a drug dealer

that established a likelihood that his house contained drugs, but in addition, it was the

officers observations of Defendant before and after the transactions.  Before three of the

four drug transactions, officers observed Defendant at his house.  (Govt.'s Ex. A.)

Before the fourth transaction, Defendant had the CI wait extra time so that he could stop

by his house first before meeting him.  (*Id.* at 5.)  When Defendant pulled in his

---

[2]Defendant also states that "there was no surveillance on Defendant prior to the transactions to rule out if the substances were obtained from any other location."  (Def.'s Br. at 5-6.)  This statement ignores the affidavit.  The officers conducted surveillance of the Defendant before three of the four transactions.  (Govt.'s Ex. A.)

driveway, he did not even turn off his car. (*Id.*)  While Defendant could have been stopping by his house for any number of innocent reasons, the fact that he sold cocaine to the CI minutes later makes it very likely that the reason he stopped by his house for such a brief period was to pick up the cocaine.  *See United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) (The issuing judge "is entitled to draw reasonable inferences about where evidence is likely to be kept").  Based on these observations as well as the drug transactions with the CI, there was a "fair probability" that contraband would be found at his house.  *Gates*, 462 U.S. at 238.

The Sixth Circuit has upheld a probable cause determination under similar circumstances.  *See United States v. Murphy*, 241 F.3d 447 (6th Cir. 2001).  In *Murphy*, a warrant was issued to search the defendant's car and the motel room that he was staying in.  *Id.* at 449.  The court described the affidavit in support of the warrant as follows:

> In this case, the affidavit stated that the informant had already been working on this case with the agents at the time of the request for the warrant. The affidavit further provided that the agents had personally observed Defendant leave his motel room after speaking with the informant on the telephone, a conversation that the agents overheard. They observed Defendant walk to his red Mustang convertible in the motel parking lot, meet with the informant, a meeting they knew involved the sale by Defendant of a quantity of crack cocaine to the informant, and return to his hotel room. Viewing the totality of the circumstances, the affidavit was sufficient to support a finding of probable cause for the warrant that was issued.

*Id.* at 458.  Like the officers in *Murphy*, the officers in this case were working with a confidential informant, who set up a meeting with Defendant to purchase narcotics. Also, as in *Murphy*, the officers in this case observed Defendant leave where he was staying after speaking with the informant on the telephone, meet with the informant – "a meeting they knew involved the sale by Defendant of a quantity of . . . cocaine to the informant," and then return to the place where he was staying.  Accordingly, like the *Murphy* court, this court finds that the affidavit is sufficient to support a finding of

probable cause to search the location where Defendant resided and where officers
observed him immediately before and after conducting the illegal drug transactions.

### 3. Staleness

Defendant makes a bare assertion that the information in the warrant was stale
and then sets out the standard for determining whether information in a search warrant
affidavit should be considered stale.  (Def.'s Br. at 4-5.)  However, Defendant provides
no real argument about why the information in the affidavit in this case is stale.  Instead,
he merely mentions the days of the sales as "10-23-08, 11-4-08, 11-12-08, and 11-24-
08" and states that the transactions were separated by a period of eight to ten days.
(Id. at 5.)

Whether information in an affidavit is stale is "determined by the circumstances of
each case."  *Sgro v. United States*, 287 U.S. 206, 210-11 (1932).  In determining
staleness, courts look to more than just calendar days, and instead consider the
following factors: "the character of the crime," "the criminal," "the thing to be seized" and
"the place to be searched."  *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998).
"[E]ven if a significant time period has elapsed since a defendant's last reported criminal
activity, it is still possible that, depending upon the nature of the crime, a magistrate may
properly infer that evidence of wrongdoing is still found to be on the premises."  *Id.*
Also, recent information that corroborates otherwise stale information can be sufficient
to establish probable cause.  *Id.* at 924.

Defendant's staleness argument is without merit.  The most obvious reason
being the fact that Defendant sold cocaine the day of the execution of the warrant.  This
event was incorporated into the warrant as the triggering event for the execution of it.
So even if the other information was stale, this recent transaction "refreshed this
otherwise stale information."  *Id.*  Defendant can point to no case where a court has
found information that was mere minutes old as too stale to support the issuance of a

warrant.  But even without the most recent purchase, it is unlikely that the information

would be considered stale.  The last purchase was only nine days before the execution

of the search warrant and fit the trend of purchases by the CI every eight to twelve days.

Accordingly, based on the circumstances of this case, the court finds the information in

the affidavit was not too stale to support a finding of probable cause by the judge that

issued the warrant.

### C. Scope of the Warrant

Defendant also argues that the officers "exceeded the scope of the warrant by

opening the locked safe without a search warrant."  (Def.'s Mot. at 2.)  Defendant

provides no further argument on this point in his brief.  And rightly so.  It is well-settled

that a "lawful search of fixed premises generally extends to the entire area in which the

object of the search may be found and is not limited by the possibility that separate acts

of entry or opening may be required to complete the search."  *United States v. Ross*,

456 U.S. 798 (1982) (noting that "a warrant that authorizes an officer to search a home

for illegal weapons also provides authority to open closets, chests, drawers, and

containers in which the weapon might be found").  Defendant's exact argument was

rejected by the Sixth Circuit in *United States v. Lengen*, 245 F. App'x 426 (6th Cir.

2007), where the defendant argued that "the warrant issued in this case authorized only

the search of the defendant's dwelling, not of the safe discovered in [the defendant's]

bedroom closet."  245 F. App'x at 434.  The Sixth Circuit reasoned that:

> although a warrant to search for a stolen vehicle would not justify opening
> a small wall safe in a bedroom closet, judicial authorization to search a
> home for contraband drugs, money associated with drug trafficking, and
> drug paraphernalia would clearly justify the opening of doors, closets,
> drawers, *safes*, and other places where the listed items could be hidden.
> Consequently, the police in this case were not required to obtain a
> separate warrant to look in the safe found in the closet of the defendant's
> bedroom.

*Id.* (emphasis added).  In the present case, the search warrant did not authorize a

search for a stolen vehicle, but instead a search for controlled substances and related

materials, including financial records.  These items could readily be hidden in a safe in a

closet, and thus, the officers were clearly justified in opening Defendant's safe without

obtaining a separate warrant.  *See id.*  Accordingly, the officers did not exceed the

scope of the search warrant.

### III. CONCLUSION

For the reasons stated above, IT IS ORDERED that Defendant's "Motion to

Suppress" [Dkt. # 21] is DENIED.


         s/Robert H. Cleland
         ROBERT H. CLELAND
         UNITED STATES DISTRICT JUDGE

Dated:  December 18, 2009


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, December 18, 2009, by electronic and/or ordinary mail.


         s/Lisa G. Wagner
         Case Manager and Deputy Clerk
         (313) 234-5522